IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SPECTOR GADON & ROSEN, P.C.,<br><br>                     Plaintiff,<br><br>    v.<br><br>ROBERT M. FISHMAN,<br><br>                     Defendant. | CIVIL ACTION<br>NO. 13-2691 (LEAD CASE) |
| ROBERT M. FISHMAN,<br><br>                     Plaintiff,<br><br>    v.<br><br>ALAN B. EPSTEIN and SPECTOR GADON<br>& ROSEN, P.C.,<br><br>                     Defendants. | CIVIL ACTION<br>NO. 13-5198<br><br><br>CONSOLIDATED CASES |

## OPINION

**Slomsky, J.**                                                                **March 31, 2015**

## I.    INTRODUCTION

These consolidated cases involve an action by counsel to collect legal fees from a former

client and, in turn, the client's suit against counsel for professional negligence or malpractice.[1]

---

[1]    These cases were consolidated on January 17, 2014 (Doc. No. 22) after Plaintiff Robert Fishman filed a Motion to Consolidate (Doc. No. 5), which was granted.  Spector Gadon & Rosen, P.C. v. Robert Fishman, No. 13-2691, is listed as the lead case.  In that case, Spector Gadon & Rosen, P.C. as Plaintiff is suing Fishman for legal fees owed to Epstein and Spector Gadon & Rosen, P.C. for representation in an arbitration proceeding instituted against Fishman's prior employer.  In the second case, Robert Fishman v. Alan Epstein and Spector Gadon & Rosen, P.C., No. 13-5198, Fishman as Plaintiff is suing Epstein and Spector Gadon & Rosen, P.C. for legal malpractice and breach of contract. The Motion for Judgment on the

Plaintiff Robert Fishman ("Fishman") retained Defendant Alan Epstein ("Epstein") and his law firm, Spector Gadon & Rosen, P.C. (collectively, "Defendants"), to pursue a claim against Fishman's former employer, United American Indemnity, Ltd. ("UAI").  Fishman contended that UAI breached his employment agreement by depriving him of certain benefits after UAI's Board of Directors terminated his employment.  As required by the employment agreement, Fishman commenced an arbitration proceeding against UAI.  During the pendency of this proceeding, Epstein attempted to negotiate a settlement with UAI.  Fishman contends that he believed that a favorable settlement agreement was reached based upon his conversations with Epstein.  The settlement with UAI, however, was never finalized.  Fishman claims in this case that Epstein was negligent in several respects for failing to have the settlement finalized, causing him to retain new counsel and settle his claim for less than the original settlement offer.

Presently before the Court is Defendants' Motion for Judgment on the Pleadings pursuant to Federal Rule of Civil Procedure 12(c).  (Doc. No. 26.)  Specifically, Defendants seek to have all claims filed against them by Fishman dismissed.  The claims are set forth in two counts: Count One against both Epstein and Spector Gadon & Rosen, P.C. for professional negligence and Count Two against Epstein alone for breach of contract.  For reasons that follow, the Court will grant Defendants' Motion for Judgment on the Pleadings.

---

Pleadings (Doc. No. 26), which is the subject of this Opinion, was filed in the second case, Fishman v. Epstein and Spector Gadon & Rosen, P.C., No. 13-5198.  All document numbers referred to in this Opinion are to the docket numbers in the second case, Fishman v. Epstein and Spector Gadon & Rosen, P.C., No. 13-5198.

## II.   BACKGROUND

### A.  Statement of Facts

#### 1.        Fishman's employment with and termination by UAI and the subsequent arbitration proceeding

On November 27, 2006, Fishman, who is an attorney, and UAI entered into an employment agreement in which Fishman was hired as the Chief Executive Officer ("CEO") of UAI.  (Doc. No. 1, Ex. 1 ¶ 3.)  The agreement contained provisions covering Fishman's compensation and benefits, severance benefits Fishman was entitled to receive if he were terminated without cause, and an arbitration clause.  (Id.)  The agreement also included a provision titled "Actions Requiring Holding Company and/or Board Approval" ("contract approval policy"), which "required Fishman to seek permission from the Board before approving any contract in excess of $500,000."  (Id. ¶ 4.)

During his tenure as CEO, Fishman employed the services of a consulting firm, Keane Worldzen, Inc. ("Keane"), "to assess the scope of the problems within UAI and implement appropriate solutions."  (Id. ¶ 5.)  On March 13, 2007, Fishman entered into a contract with Keane which provided for an "initial consultation fee" of $462,500, an amount within Fishman's signature authority under the contract approval policy.  On April 24, 2007, Fishman executed a second contract with Keane for work valued up to $2,500,000.  (Id. ¶ 7.)  Fishman alleges that before this contract was signed, he stipulated with representatives of Keane that because the contract would cost more than $500,000, it would require Board approval before it would become effective.  (Id.)  ("Fishman only executed the second contract with Keane with the understanding with [sic] that his signature could not bind UAI and that the contract was subject to UAI Board approval.")  That same day, Fishman presented the proposed second contract with Keane to the Board, and the Board rejected it.  (Id. ¶ 9.)

On May 8, 2007, less than a year after he became CEO, the Board of Directors of UAI terminated Fishman.  (Doc. No. 1, Ex. 1 ¶ 10.)  Feeling that his termination was unjustified and in violation of the employment agreement, Fishman initiated arbitration proceedings against UAI as required under the terms of his employment agreement.  He hired Epstein and his law firm, Spector Gadon & Rosen, P.C., to represent him in the arbitration.  (Id. ¶ 11.)  In this proceeding, Fishman alleged that his termination constituted a breach of his employment contract.[2]

In response, UAI counterclaimed against Fishman, alleging claims for breach of contract, breach of fiduciary duty, misappropriation of confidential information and trade secrets, and conversion.  (Id. ¶ 15.)  In particular, UAI alleged that it had cause to terminate Fishman because he violated the contract approval policy which required him to obtain Board approval before entering into the two contracts with Keane, since they were valued at over $500,000.  (Id.)  In August 2007, the Board moved to invalidate the Keane contracts by filing a lawsuit against Keane ("Keane litigation"), alleging that the contracts between Keane and UAI were invalid because Fishman lacked authority to execute them and that there was no meeting of the minds with respect to the purported agreements.  (Doc. No. 1, Ex. 1 ¶¶ 17, 19.)

Nearly two years later, on July 17, 2009, while the dispute between Fishman and UAI was still in arbitration, Epstein, in his capacity as counsel for Fishman, was scheduled to take the

---

[2]  Fishman claimed that UAI failed to pay him the wages, benefits, bonuses, and stock option rights he was entitled to receive under the terms of the employment agreement; that UAI fraudulently induced Fishman to relocate and purchase a house in Pennsylvania; that UAI illegally converted 22,457 shares of its common stock that Fishman had purchased; and that UAI slandered Fishman by publishing to members of the insurance industry and the public at large that Fishman engaged in criminal and/or unethical conduct that justified his termination.  (Doc. No. 1, Ex. 1 ¶ 13.)  In arbitration, Fishman sought compensation for full wages, benefits, bonuses, and stock options through December 21, 2010; compensation for all losses sustained by Fishman arising from the alleged fraudulent inducement to have him purchase a home in Pennsylvania; the value of 22,457 shares of UAI Common A stock on May 8, 2007; and damages for emotional distress and humiliation, loss of life's pleasures and loss of reputation arising from the alleged slander.  (Id. ¶ 22.)

deposition of Saul Fox, Chairman of the UAI Board.  (Id. ¶ 18.)  Fishman did not attend the

scheduled deposition.  (Id. ¶ 21.)  Before the deposition began, Epstein and counsel for UAI

entered into settlement negotiations.  (Id.)  The conversations appeared to be fruitful.  The parties

negotiated and allegedly agreed to material terms of a settlement.  (Id.)  For this reason, Fox's

deposition did not proceed.  (Id.)

According to paragraph 22 of the Complaint, the terms of the July 17, 2009 purported

settlement were as follows:

> a) the transfer by Plaintiff to UAI of all of his legal and equitable interest in
> 22,457 shares of UAI Common stock; b) the cooperation of the Plaintiff in
> connection with the litigation pending between UAI and Keane Worldzen, Inc. in
> the Court of Common Pleas, Montgomery County, Pennsylvania, including the
> completion of an interview and/or videotaped witness statement under oath in
> which Fishman would testify that the contract between Keane and UAI was
> subject to UAI Board approval and that this condition was known and agreed to
> by Keane; c) payment to Plaintiff by UAI of the total sum of $1,000,000.00
> without deductions, $550,000.00 to be paid within thirty days following the
> completion of the aforesaid interview and/or videotaped statement, $150,000.00
> paid by December 31, 2009, $150,000.00 by June 30, 2010 and $150,000.00 by
> December 30, 2010; d) a maximum contribution of $150,000.00 by Plaintiff, if
> the Keane litigation resulted in a final judgment in excess of $500,000.00 against
> UAI (i.e., UAI would pay the first $500,000.00 of that judgment and Plaintiff
> would be responsible for payment of the first $150,000.00 in excess of the
> $500,000.00; e) confidentiality of the settlement to the extent permitted by law;
> and f) [t]he dismissal of proceedings before JAMS.[3]

(Id. ¶ 22.)

After the settlement discussion, Epstein called Fishman and spoke to Fishman to confirm

the terms of and their agreement to the settlement.  (Id. ¶ 21.)  Counsel for UAI had the task of

preparing the written settlement agreement.  (Id. ¶ 25.)

During the next several months, Epstein "made repeated inquiries, by phone and email, as

to the status of the written agreement."  (Doc. No. 26, Ex. 2, [hereinafter "Melinson Op."], at 4.)

---

[3] "JAMS" is a private alternative dispute resolution (ADR) provider.  The arbitration was held
    under the auspices of JAMS.

On September 20, 2009, UAI forwarded a written agreement to Fishman.  (Id.)  Three weeks later, on October 5, 2009, Epstein and counsel for UAI "participated in a telephone conference to discuss Fishman's objections to the written agreement, specifically, that it included additional terms that were not part of the oral agreement reached in July."  (Id.)  The Honorable James R. Melinson, the assigned arbitrator, described the additional terms to include a "forfeiture of sums paid if Fishman breached the confidentiality provisions of the agreement, a Fishman contribution to any 'settlement' of the Keane litigation, and the forfeiture of sums paid if he failed to cooperate and tell the truth at all times in the Keane litigation."  (Id.)[4]

On October 12, 2009, counsel met to discuss these alleged additional terms.  (Id.)  At the meeting, "counsel for UAI 'urged' Fishman to accept the additional terms because the ongoing settlement negotiations between Keane and UAI were expected to be concluded soon and for an amount under the $500,000 ceiling."  (Id.)  Fishman, however, refused to accept these additional terms and no final settlement was reached at this meeting.  (Id. at 5.)  Thereafter, the Keane litigation settled on November 23, 2009 for less than $500,000.  (Id.)

On November 29, 2009, Epstein received notification from UAI counsel that effective immediately, UAI was withdrawing its settlement offer to Fishman.  (Doc. No. 1, Ex. 1 ¶ 26.)  In response, Epstein filed a motion in the arbitration to enforce the terms of the July 17, 2009 settlement discussions.  On April 24, 2011, arbitrator Melinson issued an order denying the motion, finding that the UAI Board had not approved the July 17, 2009 settlement agreement, and therefore there was no meeting of the minds with respect to the settlement.  (Id. ¶ 27;

---

[4]   The additional terms are not mentioned in the Complaint.  However, at the very least, Fishman alleged before arbitrator Melinson that a new term was "contribution to any 'settlement' of the Keane litigation."  (Melinson Op. at 4.)  This term was included in the proposed settlement agreement as alleged in paragraph 22 of the Complaint. (Doc. No. 1, Ex. 1 ¶ 22.)  Thus, Fishman's position on the timing of this alleged new term is inconsistent.

Melinson Op. at 10-12.)  Thereafter, Fishman engaged new counsel to represent him in the UAI arbitration proceeding.  (Doc. No. 1, Ex. 1 ¶ 28.)  On October 26, 2012, with his newly-hired counsel, Fishman settled his claims against UAI for less than the $1,000,000 figure agreed to during the July 17, 2009 settlement negotiations.  (Id. ¶ 29.)

### 2.      Fishman's malpractice claims against Epstein

The crux of Fishman's malpractice claim against Epstein and Spector Gadon & Rosen, P.C. arises from Epstein's purported failure to finalize the alleged settlement agreement negotiated on July 17, 2009.  Fishman's overarching grievance is that Epstein breached his professional duty to Fishman because he "failed to take steps to ensure that the settlement was documented and/or confirmed in a form which would be binding and enforceable."  (Doc. No. 1, Ex. 1 ¶ 24.)

Fishman alleges that Epstein was negligent in several ways.  First, Fishman asserts that Epstein's initial instance of negligent conduct took place immediately following the July 17, 2009 settlement discussion.  Fishman claims that despite a court reporter being present at Fox's deposition, Epstein negligently "failed to put the settlement on the record in an audible form to be transcribed by the court reporter in the event that either party would allege later that there was no settlement or disputed the terms."  (Id.)  Further, Fishman claims that Epstein was negligent by not having the terms of the settlement agreement reduced to writing and by not having the parties sign it at the conclusion of the July 17, 2009 meeting.  (Id.)

Second, Fishman alleges that Epstein failed to make adequate efforts to consummate the settlement agreement after leaving the July 17, 2009 meeting.  He claims that Epstein was negligent in allowing counsel for UAI to control the drafting of the settlement agreement.  (Id. ¶ 25.)  In this regard, he avers that Epstein's lack of control delayed the preparation of a written agreement, "which allowed UAI to continue to litigate claims with Keane and determine that it

no longer required [Fishman's] cooperation in the litigation pending between UAI and Keane

Worldzen, Inc." (Id.)  According to Fishman, this delay "allowed UAI to avoid enforcement of

the settlement by claiming that Fishman failed to cooperate in the UAI/Keane litigation."  (Id.)

Fishman claims that Epstein knew or should have known that Fishman's cooperation in the

Keane litigation was a critical term of the proposed settlement agreement and that "between July

2009 and November 2009, Epstein did nothing to ensure that Fishman's testimony in the Keane

litigation occurred and/or arrange for performance of this obligations [sic]."  (Id. ¶¶ 23, 26.)

Lastly, Fishman claims that Epstein was dilatory in seeking UAI Board approval of the

settlement terms and that he failed to inform Fishman that Board approval of the settlement was

required.  (Id. ¶ 25.)  To this end, Fishman specifically avers the following in the Complaint:

> At all relevant times, Epstein knew that: (a) Board approval of contracts was a
> critical issue in the UAI/Keane litigation; (b) a core issue in the Fishman/UAI
> arbitration was Fishman's alleged failure to obtain approval of the UAI/Keane
> contracts; (c) a critical issue in the Keane  litigation was Keane's knowledge that
> UAI Board approval was necessary.  Defendant Epstein took no steps to
> determine that UAI Board approval of [his] settlement was required and/or inform
> Fishman of the requirement of Board approval.

(Id.)

In addition to his claim of attorney negligence or malpractice, Fishman has made a claim

against Epstein for breach of contract.  Fishman reiterates the allegations of his negligence claim,

and in effect asserts that this alleged negligence also amounts to a breach of contract:

> Defendant, Epstein breached the contract by failing to writeup [sic] the terms of
> the settlement at the conclusions [sic] of the settlement discussions on July 17,
> 2009; by delaying or allowing the delay of the preparation of a settlement
> agreement until Fishman's testimony in the Keane litigation was no longer needed
> which allowed UAI to avoid enforcement of settlement and by failing to inform
> Fishman that the settlement was subject to Board approval.

(Id. ¶ 34.)

When Fishman finally settled with UAI while represented by his second lawyer, he agreed to accept as compensation less than the $1,000,000 figure proposed at the July 17, 2009 settlement discussions.  (See id. ¶¶ 30-32.)  In his suit, Fishman claims that Epstein's alleged negligence and breach of contract caused him over $1,000,000 in damages.  (Id. ¶ 30.) Accordingly, in this suit against Epstein, Fishman seeks $1,000,000 in damages in addition to attorney's fees for his subsequently hired counsel who negotiated the October 26, 2012 settlement with UAI.  (Id. ¶ 31-32.)

### B.    Procedural History

As noted above, before the Court is Defendants' Motion for Judgment on the Pleadings. (Doc. No. 26.)  Fishman filed a Response to the Motion (Doc. No. 35), and Defendants' a Reply (Doc. No. 39).  A hearing was held on the Motion on September 5, 2014.  (Doc. No. 40.)  At the hearing, the Court requested supplemental briefing.  (Doc. No. 42 at 61-63.)  Thereafter, supplemental Memoranda were filed.  (Doc. Nos. 45, 46.)  The Court held additional arguments on the Motion on November 24, 2014.  (Doc. No. 49.)  For reasons that follow, Defendants' Motion for Judgment on the Pleadings (Doc. No. 26) will be granted, and the Complaint filed in E.D. Pa. Civil Action No. 13-5198 will be dismissed in its entirety.

### III.    STANDARD OF REVIEW

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  "A motion for judgment on the pleadings is a procedural hybrid of a motion to dismiss and a motion for summary judgment."  Westport Ins. Corp. v. Black, Davis & Shue Agency, Inc., 513 F. Supp. 2d 157, 162 (M.D. Pa. 2007). Accordingly, judgment on the pleadings should be granted where the "movant clearly establishes there are no material issues of fact, and he is entitled to judgment as a matter of law."  Sikirica v. Nationwide Ins. Co., 416 F.3d 214, 220 (3d Cir. 2005).

"When deciding a motion for judgment on the pleadings pursuant to [Federal Rule of Civil Procedure] 12(c), the Court applies the same standard as that on a motion to dismiss pursuant to Rule 12(b)(6)." Chirik v. TD BankNorth, N.A., No. 06-04866, 2008 WL 186213, at *5 (E.D. Pa. Jan. 15, 2008) (citing Turbe v. Gov't of the V.I., 938 F.2d 427, 428 (3d Cir. 1991)). "The Court must accept as true all well-pleaded allegations . . . and draw all reasonable inferences therefrom in favor of the nonmoving party." Mobley v. Tarlini, 641 F. Supp. 2d 430, 437 (E.D. Pa. 2009) (citing Consol. Rail Corp. v. Portlight Inc., 188 F.3d 93, 94 (3d Cir. 1999)). However, "[t]o survive judgment on the pleadings, the complaint must contain more than blanket assertions or conclusory allegations; rather, it must include sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Verderame v. RadioShack Corp., 31 F. Supp. 3d 702, 706 (E.D. Pa. 2014) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

"As in a 12(b)(6) motion, the Court may look only to the facts alleged in the pleadings and any attachments." Mobley, 641 F. Supp. 2d at 437. "Exhibits attached to a pleading may be considered on a 12(c) motion, since under Rule 10(c), '[a] copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.'" Id. (quoting Fed. R. Civ. P. 10(c)).[5] However, an exception to this rule exists, and the Court may consider other documents not attached to the pleadings, where "plaintiff has actual notice [of such documents] and has relied upon these documents in framing the complaint." In re Burlington Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997) (internal quotation marks omitted). The specific documents a

---

[5]  Federal Rule of Civil Procedure 10 is titled "Form of Pleadings." Rule 10(c) is titled "Adoption by Reference; Exhibits" and states:

A statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion. A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.

court may consider are those "that are attached to or submitted with the complaint, and any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case.  Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006) (quoting 5B Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (3d ed. 2004)) (internal quotation marks and citations omitted).

## IV.    ANALYSIS

### A.    The Melinson Opinion Can Be Considered by the Court

As a preliminary matter, Fishman contends that in deciding the Motion for Judgment on the Pleadings, the Court should not consider the conclusion or facts asserted in the April 24, 2011 opinion of the arbitrator, the Honorable James Melinson, because it was not attached to the Complaint or Epstein's Answer, but rather was attached only to the instant Motion before the Court.  As mentioned above, a court may take into account items subject to judicial notice, matters of public record, and documents incorporated by reference or integral to the claim. Buck, 452 F.3d at 260.[6]  Normally, a court can take judicial notice of the existence of a judicial

---

[6] Although these items are usually referred to as ones that a court may consider in deciding a motion to dismiss, see In re Burlington Factory, 114 F.3d at 1426 and Buck, 452 F.3d at 260, they can also be considered in deciding a Motion for Judgment on the Pleadings.  In Mele v. Federal Reserve Bank of New York, the Third Circuit considered such extrinsic documents in deciding a motion for judgment on the pleadings, noting:

> The general rule is that a "district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings."  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997).  However an exception to this general rule provides that a "document integral to or explicitly relied upon in the complaint" may be considered "without converting the motion [to dismiss into one for summary judgment.]"  Id.  (quoting Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1220 (1st Cir. 1996)) (emphasis added in In re Burlington).  Here, consideration of the disclaimer in the Guide [the extrinsic document] clearly falls within this exception for documents "integral to or explicitly relied upon in the complaint."  The Guide forms the heart of [plaintiff's] complaint.  Thus, the

opinion, including an arbitration opinion, but not the facts contained therein.  See S. Cross
Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd., 181 F.3d 410, 426 (3d Cir. 1999)
("[O]n a motion to dismiss, we may take judicial notice of another court's opinion—not for the
truth of the facts recited therein, but for the existence of the opinion, which is not subject to
reasonable dispute over its authenticity.")

    This restriction, however, does not apply here because Fishman incorporated by reference
in his Complaint: (1) the Melinson Opinion; and (2) the facts and conclusion set forth in the
Melinson Opinion that no settlement occurred between Fishman and UAI and that it should have
been known to Fishman and his counsel that Board approval was necessary. [7]

---

    disclaimer is just the kind of evidence that the 'integral' documents exception was
    intended to encompass, so that plaintiff cannot maintain a claim "by extracting an
    isolated statement from a document and placing it in the complaint, even though if
    the statement were examined in the full context of the document, it would be clear
    that the statement [did not support the claim]."  In re Burlington Coat Factory, 114
    F.3d at 1426.

359 F.3d 251, 256 n.5 (3d Cir. 2004) (internal quotation marks omitted).

Although matters of public record or items subject to judicial notice are not mentioned, it
would follow from the quoted section in Mele that they too could be considered when a court
is ruling on a motion for judgment on the pleadings.

[7] The instant case is distinguishable from a Third Circuit decision in which the court considered
whether a district court could rely on "facts from documents related to an arbitration
proceeding, but not mentioned in, or attached to [a plaintiff's] complaint."  Brody v. Harkin,
145 F. App'x 768, 772 (3d Cir. 2005).  In Brody, the court first held that the plaintiffs did not
"open the door" for consideration of such documents by merely discussing the arbitration in
the complaint.  The court further held that it was improper for the district court to take judicial
notice of the substantive facts cited within the arbitration award.  Id. at 772-73.  It stated:
"[E]ven if the District Court merely noticed the existence of the award, that limited use of the
award was impermissible because the [plaintiffs] did not rely on the award in their
complaint."  Id. at 773. (citation omitted).

Brody is distinguishable here because, as discussed above, Fishman relies on the Melinson
Opinion in which Melinson found that no settlement occurred and the parties knew that Board
approval was necessary.  As noted, this holding is integral to the legal malpractice claim that

Fishman specifically mentions the Melinson Opinion in his Complaint:

> On April 24, 2011, JAMS issued an Order denying Plaintiff, Robert M. Fishman's Motion to Enforce the Settlement Agreement because the UAI Board had not approved the July 2009 settlement and therefore, there was no meeting of the minds with respect to the settlement.  The arbitrator explained that it should have been known that UAI Board approval was necessary.

(Doc. No. 1, Ex. 1 ¶ 27.)  Since Fishman refers to the decision of the arbitrator in his Complaint, by not only relying on the conclusion that there was no settlement but also relying on the fact that it should have been known that UAI Board approval was necessary, Fishman opened the door to consideration of the arbitrator's opinion and its factual content.  Without question, the fact that it should have been known that UAI Board approval was necessary is integral to Fishman's legal malpractice claim against Epstein.

Not only does Fishman explicitly cite the Melinson Opinion in the Complaint, he also relies on arbitrator Melinson's denial of his motion to enforce the terms of the proposed settlement as being integral to his claims alleged here because it serves as a crucial link in the chain of events leading to Fishman's malpractice claim: had the arbitrator ruled in Fishman's favor, the underlying employment matter would have settled for $1,000,000 and this action would not have been filed.  See Dix v. Total Petrochemicals USA, Inc., No. 10-3096, 2011 WL 2474215, at *1 (D.N.J. June 20, 2011) (permitting, in the motion to dismiss context, consideration of a document outside the complaint "when the claim would not exist but-for the existence of the document").  Accordingly, the Melinson Opinion, including its factual underpinning, can be considered by the Court in deciding the Motion for Judgment on the Pleadings.

---

Fishman asserts against Epstein and Spector Gadon & Rosen, P.C.  See Irish v. Ferguson, 970 F. Supp. 2d 317, 353 (E.D. Pa. 2013) (distinguishing Brody for the same reasons and permitting consideration of two extrinsic documents that were referred to, and also relied on, in plaintiff's complaint).

**B.      Plaintiff Has Failed to Plausibly State a Claim of Professional Negligence or Breach of Contract**

**1.      Professional Negligence**

Fishman has made a claim against Epstein and Spector Gadon & Rosen, P.C. for professional negligence or legal malpractice.  Under Pennsylvania law, in order to establish such a claim, the following three elements must be met: (1) the employment of the attorney or other basis of duty inuring to a plaintiff's benefit; (2) the failure of the attorney to exercise ordinary skill and knowledge which would normally be exercised by members of the profession under the same or similar circumstances; and (3) the attorney's negligence was the proximate cause of damage to the plaintiff.  Composition Roofers Local 30/30B v. Katz, 581 A.2d 607, 609 (Pa. Super. 1990); McPeake v. Cannon Esquire, P.C., 553 A.2d 439, 441 (Pa. Super. 1989); Reynolds v. Stambaugh, Nos. 1889 MDA 2013, 1890 MDA 2013, 2015 WL 674293, at *4 (Pa. Super. Feb. 5, 2015).

Here, Epstein and Spector Gadon & Rosen, P.C. concede that they were hired to represent Fishman in his arbitration matter against UAI, which satisfies the first element.  Looking at the second element, Fishman has not stated a plausible claim for legal malpractice.  Viewing the allegations in the pleadings in the light most favorable to Fishman, he has averred no plausible facts that show how Epstein's actions or inactions could be the basis for a finding that he did not exercise the skill and knowledge required of attorneys under the same or similar circumstances.  As a result of this finding, there is no need to consider the third element, proximate cause.

**a.      Epstein did not breach his duty to Fishman by failing to secure a binding settlement on July 17, 2009**

Fishman claims that Epstein first breached his professional duty to Fishman at the initial settlement discussions on July 17, 2009 because: (1) he failed to have the terms of the settlement put on the record despite a court reporter being present; (2) he did not reduce the terms of the

settlement to writing; and (3) he failed to have the parties sign the writing, acknowledging agreement to the terms, at the conclusion of the meeting.  Fishman alleges that had Epstein done these three things, a binding and "enforceable" settlement would have been reached on that date.  However, given the facts alleged in the Complaint and discussed in the Melinson Opinion, these alleged actions would not have created a binding settlement.

Even if Epstein had made the effort to have the court reporter take down the terms of the alleged settlement, or to get a signed, written settlement agreement at the conclusion of the July 17, 2009 meeting, these actions would not result in a binding settlement because the UAI Board did not yet approve it.  As mentioned above, UAI maintained a contract approval policy requiring that contracts worth over $500,000 would have to be approved first by the UAI Board of Directors.  Additionally, there were company litigation guidelines that required Board approval of settlements in excess of $500,000.  (Melinson Op. at 11.)

Fishman's payout under the July 17, 2009 settlement discussions was set at $1,000,000, an amount that clearly surpassed the $500,000 threshold.  Fishman was acutely aware of this policy at the time of the July 17, 2009 settlement discussion because it played a ubiquitous role in Fishman's hiring and firing: Fishman was bound to follow the policy under his employment agreement, and Fishman's alleged failure to follow this policy in his dealings with Keane was the basis of Fishman's termination and UAI's subsequent litigation with Keane.  Fishman admits to being aware of the contract approval policy in the Complaint, stating "Fishman only executed the second contract with Keane with the understanding with [sic] Keane that his signature could not bind UAI and that the contract was subject to UAI Board approval."  (Doc. No. 1, Ex. 1 ¶ 8.)  Moreover, Fishman was aware of the company litigation guidelines requiring Board approval of settlement amounts above $500,000.  (Melinson Op. at 11.)  Thus, there could be no meeting of

the minds to constitute a settlement on July 17, 2009 because the UAI Board needed to assent to

paying the $1,000,000 and Fishman was aware of this requirement despite his claims that Epstein

never informed him of the requirement.  See S. Cross Overseas Agencies, Inc., 181 F.3d at 426

(finding that because the plaintiffs relied on a judicial opinion and specifically referenced it in

their complaint, the Court could "examine the decision to see if it contradicts the complaint's

legal conclusions or factual claims").

Arbitrator Melinson made these findings in his opinion on Fishman's Motion to enforce

this alleged settlement agreement.  (Melinson Op. at 9.)  He noted:

> The prior dealings of the parties support the conclusion that Fishman understood
> that once the settlement agreement was executed—it required Board approval—
> even if Mr. Epstein did not have the same understanding.  I note that Fishman is a
> lawyer and has extensive experience in the insurance industry.  It is uncontested
> that Fishman's employment agreement was negotiated by Fishman and Fox,[8] but
> required Board approval.
>
> ***
>
> Fishman's experience as CEO of UAI also mitigates against this motion.  Fishman
> agrees that as CEO, he participated in the settlement of litigation that resulted in
> written agreements that were approved by the Board.  Fishman was also aware of
> the company litigation guidelines that required Board approval of settlements in
> excess of $500,000.

(Id. at 10-11.)

Despite knowing about the need for Board approval, Fishman claims that UAI could have

been bound by the settlement on July 17, 2009.  He contends that that a lawyer can bind his

client, asserting "it is clear that Epstein would have been able to bind Fishman and underlying

Defendant's [UAI's] counsel would have been able to bind underlying Defendant [UAI] as a

matter of law."  (Doc. No. 45 at 2.)  This argument is an incomplete statement of the law because

---

[8]   As noted above, Saul Fox was the Chairman of the UAI Board of Directors.

it "is clear and well-settled than an attorney must have express authority in order to bind a client to a settlement agreement."  Reutzel v. Douglas, 870 A.2d 787, 789-90 (Pa. 2005).

Fishman attempts to skirt the express authority requirement by relying upon Rockey v. Big Springs School District, 699 A.2d 1331 (Pa. Commw. Ct. 1997).  In Rockey, the court held that "[t]here is a presumption that a settlement entered into by an attorney has been authorized by the client, although rebuttal of the presumption will render the purported settlement ineffective."  Id. at 1334 (emphasis added).  Here, any presumption of authority granted to UAI's counsel is unequivocally rebutted by the fact that Board approval was necessary and both parties knew that such approval was a precondition to any contract or settlement or that would bind UAI to pay an amount in excess of $500,000.

Fishman also claims that Fox had authority to bind the Board on July 17, 2009 regarding the settlement agreement because he "is the chairman and (he and his private equity company) is [sic] super-majority shareholder in UAI (i.e., Fox is the Board)."  (Doc. No. 35 at 11.)  Counsel for Fishman reiterated this argument at oral argument held on November 24, 2014: "Mr. Fox, who agreed to the settlement, is, essentially, the board.  His—I've been told by my client—and, again, this might be why discovery is needed."  (Doc. No. 49 at 31.)

The fact that Fox is a majority shareholder and Chairman of the Board does not enable him to bind the entire UAI Board of Directors on a contract.  Fishman knew this fact because his own employment contract contains the following provision:

> This document sets forth the agreement between Robert M. Fishman ("CEO") and United America Indemnity, Ltd. ("The Company") regarding all matters relating to CEO's prospective employment by the Company, but shall constitute the legally binding agreement of CEO and the Company ("The Agreement") if and only if it is manually executed by (i) CEO and Saul Fox, in his capacity as chairman of the board of directors (the "Board") of the Company (the "Chairman"), and (ii) it is confirmed by the affirmative vote of the majority of the Board.

(Doc. No. 1, Ex. 10.) (emphasis added).

Arbitrator Melinson's response to this argument is additionally persuasive: "Fishman's belief that he knew Saul Fox and that Fox controlled the Board and the voting shares of the organization does not change the fact that Board approval was required and would not be sought until a written agreement was executed."  (Melinson Op. at 10.)

Thus, any argument that Epstein was negligent in failing to "enforce" a settlement that was unenforceable at its inception must fail.  Accordingly, Epstein's alleged conduct at the July 17, 2009 meeting between the parties does not amount to legal malpractice.

>    **b.**    **Epstein's lack of control over the drafting of the settlement agreement and the delay resulting from further negotiations do not support a claim for legal malpractice**

Despite first contending that UAI Board approval was not necessary to a binding settlement on July 17, 2009, Fishman paradoxically argues that Epstein's failure to seek Board approval in a timely manner following the July 17, 2009 meeting establishes a plausible claim for legal malpractice.  In this vein, Fishman alleges that: (1) Epstein was negligent in allowing counsel for UAI to control the drafting of the settlement agreement; (2) Epstein's lack of control delayed preparation of a written agreement, which gave UAI time to settle the Keane litigation; (3) Epstein "failed to seek timely UAI Board approval of the settlement agreement and/or inform [Fishman] that Board approval was required; and finally (4) Epstein "did nothing to ensure Fishman's testimony in the Keane litigation."  (Doc. No. 1, Ex. 1 ¶¶ 25, 26.)

Fishman's four grievances do not state a claim warranting relief.  By advancing these arguments, Fishman is again asking in his Complaint for a court to find that an attorney committed malpractice because that attorney failed to do the impossible.  It would have been impossible for Epstein to force UAI to sign any settlement agreement, no matter how much

pressure Epstein exerted on UAI. As arbitrator Melinson found, Fishman knew that Board approval was required for there to be a binding settlement agreement and his allegation that Epstein failed to inform him that Board approval was required belies every plausible fact in the record. It is an unsupportable conclusion. Similarly, it would be impossible for Epstein to manipulate the progress of the Keane litigation, a proceeding over which Epstein had no control, in order to ensure that Fishman's testimony was necessary in that litigation and to safeguard the value of Fishman's settlement. This Court will not accept the purported claim that Defendants controlled the will of UAI's Board when it is totally contrary to the facts of record in this case.

Moreover, Fishman's contention that Epstein was dilatory in his communications with UAI is not supported by the facts even when they are viewed in the light most favorable to Fishman. Under the subheading entitled "Fishman's perspective" in the Melinson Opinion, arbitrator Melinson noted that "Epstein made repeated inquiries, by phone and email, as to the status of the written agreement." (Melinson Op. at 4.) Several settlement conferences were held between Fishman and UAI before the Keane litigation was settled. On October 5, 2009, Epstein and counsel for UAI participated in a telephone settlement conference. (Id.) At this conference, Fishman objected to the additional terms that UAI had included in a draft agreement it sent to Epstein on September 20, 2009. (Id.) As of the meeting held October 12, 2009, Fishman's potential testimony in the Keane litigation was still required and was included as a potential term of settlement. On this date, UAI also warned Fishman that Keane was on the verge of settlement. No settlement between Fishman and UAI was reached at this meeting, Keane settled over a month later, and UAI withdrew its settlement offer. Thus, Fishman's potential testimony in the Keane litigation was still possible as of October 12, 2009, and Fishman, knowing that no

settlement had been reached, assumed the risk that by not accepting the terms set forth by UAI,
the offer would be rescinded.

Accordingly, the arguments that Epstein failed to control the drafting of the settlement
agreement, failed to seek UAI Board Approval, and did nothing to ensure Fishman's testimony in
the Keane litigation are not supported with plausible facts given the allegations in the pleadings
and the opinion of arbitrator Melinson. For all these reasons, the Motion for Judgment on the
Pleadings will be granted on Count One of the Complaint.

### 2. Breach of Contract

Count Two of the Complaint alleges a breach of contract claim against Epstein. In
paragraph 34 of the Complaint, Fishman alleges that Epstein:

> Breached the contract by failing to put the settlement on the record and by failing
> to writeup [sic] the terms at the conclusions of the settlement
> discussions on July 17, 2009; by delaying or allowing the delay of the preparation
> of a settlement agreement until Fishman's testimony in the Keane litigation was
> no longer needed which allowed UAI to avoid enforcement of settlement and by
> failing to inform Fishman that the settlement was subject to Board approval.

(Doc. No. 1, Ex. 1 ¶ 34.)

In Pennsylvania, legal malpractice actions sounding in contract are labeled "assumpit"
actions based on breach of the attorney-client agreement. Bailey v. Tucker, 621 A.2d 108, 115
(Pa. 1993). "Where a plaintiff pursues a legal malpractice claim under a breach of contract
theory, he or she must prove: (1) the existence of a contract, including its essential terms; (2) a
breach of a duty imposed by the contract; and (3) resultant damages." Nuyannes v. Thompson,
No. 11-2029, 2012 WL 1033912, at *11 (E.D. Pa. Mar. 27, 2012) (citing CoreStates Bank, N.A.
v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. 1999).

Fishman relies upon the same facts to establish his breach of contract claim that he relies
upon to support his malpractice claim. These facts do not plausibly show professional

negligence or breach of a duty imposed by the contract.  Because this element of the contract

claim has not been sufficiently set forth, no breach of contract occurred.  Accordingly, the

Motion for Judgment on the Pleadings also will be granted on Count Two.

### C.    Fishman's Theory of Recovery is Based on Impermissible Speculation

The damages that Fishman seeks in this case are impermissibly speculative.  In a legal

malpractice action, proof of actual harm is necessary.  Duke & Co. v. Anderson, 418 A.2d 613

(Pa. Super. 1980).  Duke elaborated that it is a plaintiff's burden to show that "but for the

negligence complained of, the client would have been successful in the prosecution or defense of

the action in question."  Id. at 618.

The damages in this case are not based on the damages sought against UAI in the

arbitration proceedings, but are based on the $1,000,000 settlement offer minus the actual

settlement amount received by Fishman, plus the request for counsel fees to pay the lawyer that

replaced Epstein.[9]  At oral argument held on September 5, 2014 counsel for Fishman confirmed

that this measure of damages is the theory relied upon to show harm to his client.  The transcript

contains the following exchange:

> THE COURT: But what about the fact there's a claim that you—you just
> can't calculate damages; it's too speculative?

---

[9]    In paragraph 31 of the Complaint, Fishman alleges: "The Defendant, Alan B. Epstein's
negligent acts proximately caused the Plaintiff, Robert M. Fishman, to lose the settlement
amount of $1,000,000.00."  (Doc. No. 1, Ex. 1 ¶ 31.)

In Fishman's "WHEREFORE" clause at the end of the Count One negligence claim, it states:

> Plaintiff, Robert M. Fishman prays that the Court enter Judgment in his favor
> against the Defendants, Alan B. Epstein and Spector, Gadon and Rosen, P.C. [sic]
> in the sum of $1,000,000.00.

(Id. at 9.)

A similar "WHEREFORE" clause is set forth at the end of the Count Two contract claim, but
only Epstein is named as the defendant.  (Id. at 10.)

> [COUNSEL]: A million dollars minus what he got plus what he had to pay to get it.  I don't know how you can't calculate that.  If I had the numbers in front of me, I could do it in six seconds.
>
> THE COURT: Well, you know what he settled for, right?
>
> [COUNSEL]: Right now, because it's not—it wasn't pertinent for this hearing, I don't recall the amount, but it was severely diminished.
>
> THE COURT: So you're saying he settled for less?
>
> [COUNSEL]: Yes. And had to pay the attorney—pay another attorney to make that happen.

The damages that Fishman seeks are impermissibly speculative.  They are based on an amount that was included in the settlement negotiations.  A settlement was never reached and UAI's offer was withdrawn.  The notion that the $1,000,000 figure would not have changed had negotiations continued and a settlement finalized is based on pure speculation.

In Schenkel v. Monheit, the Court held that monetary figures reflecting the "settlement value" of a case discussed during settlement negotiations cannot be alleged as the actual harm necessary to sustain a legal malpractice action.  405 A.2d 493, 495 (Pa. Super. 1979).  In Schenkel, defendant, an attorney, entered into settlement discussions on behalf of his client, a personal injury plaintiff who was injured in a motor vehicle accident.  Two disparate estimates of the "settlement value" of the plaintiff's case were discussed during these negotiations—$75,000 and $25,000.  Id. at 494.  However, the parties did not reach settlement, the plaintiff hired new counsel, the case went to trial, and a jury awarded the plaintiff $9,500 in damages.  Plaintiff sued his first lawyer for legal malpractice, claiming that had his first attorney joined a corporate defendant, he would have been able to recover a figure closer to the settlement values discussed in the settlement negotiations.  The Superior Court disagreed, ultimately holding, "we cannot look to two isolated estimates of damages made during a conference between those parties to the

22

personal injury action and say that one of these statements correctly establishes appellant's

damages." Id. at 495  see also McCartney v. Dunn & Conner, Inc., 563 A.2d 525, 530 (Pa.

Super. 1989) ("[A]ppellant's contention that appellees were negligent because they failed to

evaluate the settlement potential of the [] counterclaim is entirely speculative, and thus no cause

of action for legal malpractice may be maintained. . . . [T]his Court has not allowed legal

malpractice actions based upon speculations regarding settlement negotiations."); Mariscotti v.

Tinari, 485 A.2d 56, 58 (Pa. Super. 1984) (holding that claim that plaintiff could have obtained a

better settlement in a divorce proceeding if her attorney had correctly valued her husband's stock

was "based on pure speculation").  Consequently, where, as here, damages are impermissibly

speculative, the legal malpractice claim and by extension the breach of contract claim must be

dismissed.[10]

## V.    CONCLUSION

For the forgoing reasons, Defendant's Motion for Judgment on the Pleadings (Doc. No.

26) will be granted.[11]  An appropriate Order follows.

---

[10] Defendants also argue that they are entitled to judgment on the pleadings under the Muhammed doctrine.  This doctrine was established by the Pennsylvania Supreme Court in the case Muhammed v. Strassberger, McKenna, Messer, Shilobod & Gutnick, 587 A.2d 1346 (Pa. 1991).  In Muhammed, the court held that a client, no matter how dissatisfied with a settlement he willingly accepted, cannot sue his lawyer who settled the case for legal malpractice based on what he perceives to be a "bad deal" unless the plaintiff can show that they lawyer fraudulently induced the settlement.  However, after the Muhammed decision, courts have held that the Muhammed doctrine does not apply to predecessor counsel who did not participate in settling the underlying case.  See Wassall v. DeCaro, 91 F.3d 443, 448 (3d Cir. 1996) (holding that Muhammed does not apply "if the attorney sued did not settle the case"); Reynolds v. Stambaugh, Nos. 1889 MDA 2013, 1890 MDA 2013, 2015 WL 674293, at *10 (Pa. Super. Feb. 5, 2015) (mentioning that Muhammed does not bar a legal malpractice suit against predecessor counsel); White v. Kreithen, 644 A.2d 1262, 1265 (Pa. Super. 1994) ("It is thus apparent that Muhammed does not control the present case since the settlement in the underlying action was not a settlement negotiated by counsel for appellant.").

[11] Although not in a formal motion, counsel for Fishman requests that the Court grant him leave to amend the Complaint to aver facts that support his previous statements that Saul Fox "was

the Board," meaning that his signature alone could bind the UAI Board of Directors to a settlement.  (Doc. No. 35 at 11 n.4; Doc. No. 45 at 2.)  This request to amend would be futile because the plausible facts establish that no claim for professional negligence or breach of contract has been sufficiently alleged.  See Slater v. Marshall, 915 F. Supp. 721, 724 (E.D. Pa. 1996) ("We need not grant leave to amend when it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which could entitle him to relief." (internal quotation marks omitted)).

In addition, Fishman has filed a Motion to Stay the proceedings (Doc. No. 28) in this case pending adjudication of the Motion for Judgment on the Pleadings.  This Motion is now moot, and as such, will be denied.